# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### AUGUSTA DIVISION

| | | |
|---|---|---|
| ROBERT M. TAYLOR, III et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00047-JRH-BKE |
| | ) | |
| UNIVERSITY HEALTH SERVICES, INC. | ) | |
| and PIEDMONT HEALTHCARE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

Edward H. Wasmuth, Jr.
Georgia Bar No. 739636
SMITH GAMBRELL & RUSSELL, LLP
1105 W. Peachtree Street, NE
Suite 1000
Atlanta, GA 30309
404.815.3503
ewasmuth@sgrlaw.com

Emily E. Friedman
(admission application in process)
SMITH GAMBRELL & RUSSELL, LLP
1105 W. Peachtree Street, NE
Suite 1000
Atlanta, GA 30309
404.815.3948
efriedman@sgrlaw.com

*Attorneys for Defendants University Health
Services, Inc. and Piedmont Healthcare, Inc.*

Table of Contents

Page

PRELIMINARY STATEMENT ..................................................................................3

ARGUMENT AND CITATION OF AUTHORITY ........................................................4

I.   Applicable Legal Standard. .........................................................................4

II.  Plaintiffs' State Action Is Completely Preempted By ERISA Because Plaintiffs Can Bring Their Claim Under ERISA Section 502(a)..........................................................5

     A.   The purported "contract" containing an alleged promise to provide Plaintiffs with lifetime benefits is an ERISA plan. ......................................................6

     B.   The ERISA plan is not a "governmental plan."...........................................9

     C.   The ERISA plan is not an unfunded "excess benefit plan.".......................18

III. Plaintiffs' State Action Is Completely Preempted By ERISA Because No Other Independent Legal Duty Is Implicated. .........................................................19

     CONCLUSION...........................................................................................20

Defendants University Health Services, Inc. ("UHS") and Piedmont Healthcare, Inc. ("Piedmont") (collectively, "Defendants"), by and through their undersigned counsel, hereby submit their opposition to Plaintiffs' Motion to Remand (Docs. 8 & 9) (collectively, the "Remand Motion").

## PRELIMINARY STATEMENT

Plaintiffs' Remand Motion fails to demonstrate any legal basis for their contention that this case belongs in state court. In support of their Motion, Plaintiffs argue that their state law claims are not completely preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") because they are not seeking relief with respect to ERISA-governed benefits or an ERISA-governed plan. Instead, Plaintiffs argue they are seeking to enforce the terms of an individual employment contract (with no less than 170 individuals). However, there can be no serious dispute that the benefits Plaintiffs claim entitlement to here – free lifetime Medicare supplement benefits – are medical benefits that fall squarely within ERISA's broad definition of a covered employee welfare benefit plan. Thus, any purported promise by UHS to provide Plaintiffs with those benefits cannot be likened to an individual employment contract as a matter of law.

Plaintiffs alternatively argue that, even if the purported contract is an employee benefit plan, it nonetheless is exempt from ERISA under the "governmental plan exemption." But Plaintiffs fail to provide any legal support for their contention that UHS (and now Piedmont) – private nonprofit corporations who employ their own employees and have complete discretion and control over the terms and conditions of their own employee benefits programs – can be construed as an instrumentality of government under ERISA. Nor does any of the evidence Plaintiffs submit – including the testimony from Plaintiff Robert Taylor – support a contrary finding. When analyzed in the proper context and under the correct legal standard, all of the evidence

demonstrates that Defendants are not governmental instrumentalities for purposes of satisfying ERISA's governmental plan exemption.

For these reasons and those discussed more fully below, Plaintiffs state law action is completely preempted by ERISA and, therefore, the Court has federal jurisdiction over this case.

## ARGUMENT AND CITATION OF AUTHORITY

### I.  Applicable Legal Standard.

Plaintiffs fail to apply the correct legal standard in their Remand Motion. With respect to the remand issue, Plaintiffs argue that the "well-pleaded complaint rule" should govern and that this case should be remanded to state court because Plaintiffs have only alleged state law claims in their complaint. *See* Doc. 9, p. 4 ("Because Plaintiffs' complaint[] here allege[s] only state law claims involving breach of contract it has nothing to do with Federal law"; "[t]he complaint filed by Plaintiffs did not allege that the claims were related to ERISA in any way, nor did it allege that this was part of an employee-sponsored benefit program for an employee"). The well-pleaded complaint rule has no application here.

Complete preemption under ERISA is an <u>exception</u> to the well-pleaded complaint rule. *See Garcon v. United Mutual of Omaha Ins. Co.,* 779 F. App'x 595, 597 (11th Cir. 2019) ("[C]omplete preemption, also known as super preemption, is a judicially-recognized exception to the well-pleaded complaint rule."). Complete preemption derives from ERISA's civil enforcement provision, 29 U.S.C. § 1132(a), ERISA § 502(a), which "creates a civil cause of action for participants and beneficiaries of ERISA plans to recover benefits or enforce rights under an ERISA plan." *Borrero v. United Healthcare of N.Y., Inc.*, 610 F.3d 1296, 1301 (11th Cir. 2010) (quoting ERISA § 502(a)). This section has such "extraordinary preemptive power that it converts an ordinary state [] law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Garcon*, 779 F. App'x at 597 (internal citations omitted). Thus,

4

complete preemption applies – and affords federal question jurisdiction – regardless of the labels placed on the claims alleged or the way in which a plaintiff may characterize them. *See, e.g., Whitt v. Sherman Int'l Corp,* 147 F.3d 1325, 1329 (11th Cir. 1998) (under the complete preemption doctrine, "super preemption applies, and federal jurisdiction exists, even if the face of the complaint does not plead federal claims").

The Supreme Court and the Eleventh Circuit apply a two-part test for the complete preemption analysis. A state law claim is completely preempted by ERISA, and removable to federal court, if the following two conditions are met: (1) the plaintiff must have been able to, at some point in time, bring his claim under ERISA's civil enforcement provision, ERISA § 502(a), and (2) there must be no other legal duty, independent of ERISA, that is implicated by the defendant's actions. *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1344 (2009) (citing *Aetna Health, Inc. v. Davila*, 542 U.S. 209, 210 (2004)).

Plaintiffs do not directly address this legal framework in their Remand Motion. Nonetheless, as set forth in further detail below, both of ERISA's complete preemption conditions are met here.

## II. Plaintiffs' State Action Is Completely Preempted By ERISA Because Plaintiffs Can Bring Their Claim Under ERISA Section 502(a).

By Plaintiffs' own pleading, their claim is premised on the purported terms and conditions of an ERISA plan. Thus, they may avail themselves of all rights and remedies available to them under ERISA Section 502(a), ERISA's exclusive civil enforcement scheme. Plaintiffs attempt to avoid application of ERISA – and thus, ERISA Section 502(a) – by arguing the purported contract upon which they base their state law claim is not an ERISA plan because it is (1) akin to an employment agreement or "employee incentive plan," (2) subject to ERISA's "governmental plan" exemption, and (3) subject to ERISA's "excess benefit plan" exemption. Doc. 9, pp. 2 – 7. None

of these arguments have any merit.

**A.      The purported "contract" containing an alleged promise to provide Plaintiffs with lifetime benefits is an ERISA plan.**

Plaintiffs' Complaint seeks a declaration from the Court that Defendants cannot terminate the purported "contract" they have with Plaintiffs to provide them with lifetime medical benefits. Doc. 1-1 (Compl.), ¶ 18 & "Wherefore" Clause, paragraph (b)).  The referenced "contract" is an ERISA plan.  More specifically, the purported "contract" to provide the "free" Medicare supplement benefits to Plaintiffs is an "employee welfare benefit plan," as such term is defined under ERISA Section 3(1):

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund *or program which was heretofore or is hereafter established or maintained by an employer . . . for the purpose of providing for its participants* or their beneficiaries, *through the purchase of insurance or otherwise* . . . *medical*, surgical or hospital care or *benefits*, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or [other types of benefits] . . .

29 U.S.C. § 1002(1) (emphasis added); *see also Randol v. Mid-West Nat. Life Ins. Co. of Tenn.*, 987 F.2d 1547, 1550 (11th Cir. 1993) ("to be an [ERISA-covered] employee welfare benefit plan, the intended benefits must be health, accident, death or disability, unemployment or vacation benefits; the intended beneficiaries must include . . . employees, former employees or their beneficiaries; and an employer . . . must establish or maintain the plan, fund or program").

Notably, there is no dispute as to any of the relevant ERISA plan facts.  Plaintiffs plead they were all private employees of UHS and that UHS (and later Piedmont), in their employer capacities, established and maintained a benefits program for purposes of providing certain employees "free" Medicare supplement benefits.  *See* Doc. 1-1 (Compl.), ¶¶ 1, 3, 4, 7-12 (alleging the private employer/employee relationship and that they were furnished with benefits and documentation outlining the terms and conditions and eligibility requirements of those benefits).

Plaintiffs further allege these "free" Medicare supplement benefits were initially established by UHS as part of a program to encourage retention and provide a benefit to employees once they retired. *Id.*, ¶ 10.

These Medicare supplement benefits are retiree medical benefits – the quintessential form of employer-sponsored welfare benefits enumerated under ERISA's statute. *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan" as any program established or maintained by an employer for the purpose of providing *medical* or other benefits). Indeed, courts have consistently recognized that these types of welfare benefits are ERISA-governed benefits. *See Chamblin v. Towers Watson Delaware, Inc.,* 2018 WL 10593892, *2 (N.D. Ala. July 26, 2018) (holding that a healthcare reimbursement arrangement,  specifically a Medicare supplement plan, is employee welfare benefit plan governed by ERISA); *see also Klass v. Allstate Ins. Co.*, 21 F.4th 759, 761-762 (11th Cir. 2021) (retiree lawsuit challenging employer's decision to stop paying premiums for retiree life insurance coverage adjudicated under ERISA); *Alday v. Container Corp. of Am.*, 906 F.2d 660, 663 (11th Cir. 1990) (dispute involving retiree health insurance benefits adjudicated under ERISA); *Randol*, 987 F.2d at 1549-50 (employer's payment of premiums for employees' health coverage was an employee welfare benefit plan under ERISA); *Clark v. Unum Life Ins. Co. of Am.*, 95 F. Supp. 3d 1335, 1350-51 (M.D. Fla. 2015) (employer's payment of premiums for disability insurance coverage was an ERISA plan) (citing Eleventh Circuit precedent).

Plaintiffs attempt to avoid the ERISA plan issue by arguing the purported "contract" is a "simple" employment agreement or "employee incentive plan." Doc. 9, pp. 7 – 8. The argument ignores ERISA's broad statutory definition of an ERISA-governed "employee welfare benefit plan," which is any "plan, fund, *or program*" established by an employer to provide medical

benefits to employees. 29 U.S.C. § 1002(3) (emphasis added). Thus, even an employment contract will constitute an ERISA plan if it satisfies the "plan, fund or program" test and permits a "reasonable person" to "ascertain [1] the intended benefits, [2] a class of intended beneficiaries, [3] the source of financing, and [4] procedures for receiving benefits." *See Williams v. Wright*, 927 F.2d 1540, 1543 (11th Cir. 1991) (individual employment contract providing for post-retirement compensation was an ERISA plan, despite having only one intended beneficiary; ERISA coverage issues are to "be construed liberally") (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)); *Woods v. Radiation Therapy Serv., Inc.*, 2017 WL 727766, *7 (M.D. Fla. Feb. 24, 2017) (employment contract, in which employer promised to pay severance and COBRA premium payments upon termination, was an ERISA plan); *Thomas v. First Southern Bank*, 2017 WL 4398653, *2-3 (N.D. Ga. 2017) (contract for "salary continuation" following employee's termination from employment was an ERISA plan; "[t]he preemptive force of ERISA is so powerful as to displace entirely any state cause of action' for violation of contracts between an employee and his employer regarding retirement benefits") (internal quotations and citations omitted); *see also Clark*, 95 F. Supp. 3d at 1350-51 (benefit program was ERISA plan even though employer never labeled it "ERISA").

Here, all four criteria are satisfied to support a finding by this Court that the alleged "contract" constitutes an ERISA "plan, fund or program." Plaintiffs' own pleading demonstrates that the intended benefits are Medicare supplement benefits (*i.e.*, medical benefits). Doc. 1-1 (Compl.), ¶¶ 5, 7 – 10 & Ex. A. The intended beneficiaries are those employees employed by UHS prior to January 1, 2005, who had 30 years of service at the time of their termination of employment with UHS and are Medicare eligible. *Id.*, ¶¶ 5, 7 & 9.  The sources of financing are the premiums

paid by UHS from its general assets.[1] *Id.*, ¶¶ 7 – 9 & Ex. A at pp. 9 – 17 of 49 (showing annual premiums were paid by UHS directly to insurance carriers). Finally, the procedure for receiving the benefits is that UHS provides eligible retirees the requisite election paperwork to enroll in the program, and then UHS pays the premiums, on eligible participants' behalf, directly to the Medicare supplement health insurance carrier. *Id.*, Ex. A at pp. 9 – 17 of 49*; see also* Affidavit of David Belkoski ("Belkoski Aff."), attached hereto, ¶ 18 & Ex. D (attaching paperwork).

Plaintiffs cite to a lone Eighth Circuit decision, *Crews v. General Am. Life Ins.*, for the erroneous proposition that this case is not governed by ERISA because it involves a contractual dispute. *Crews* is inapposite. The case involved an alleged promise that called for a one-time lump sum severance payment to a single terminated employee. 274 F.3d 502, 506 (8th Cir. 2001). Thus, the purported promise did not involve a group of intended beneficiaries or any long-term obligations by the employer. By contrast, the retiree medical benefit program at issue here involves an administrative scheme (*i.e.*, the provision of continued benefits to no less than 170 retirees who satisfy eligibility criteria) for benefits that Plaintiffs contend were promised to them for life.

For all of these reasons, there can be no question the purported contract at issue here is an ERISA plan. ERISA therefore affords Plaintiffs the ability to pursue a claim under its civil enforcement provision, ERISA Section 502(a), for relief in connection with Defendants' purported contractual obligation to provide them with lifetime benefits.

**B.    The ERISA plan is not a "governmental plan."**

Plaintiffs alternatively argue that, even assuming the plan at issue here could be construed

---

[1] Payment of benefits by an employer through the employer's general assets "does not affect the threshold question of ERISA coverage." *Williams*, 927 F.2d at 1544; *Woods*, 2017 WL 727766 at n.9 (same); *see also Clark*, 95 F. Supp. 3d at 1351 (fact that employer paid premiums out of its own funds was sufficient to satisfy the "source of financing" requirement).

as an employee welfare benefit plan, it is nonetheless exempt from ERISA because it is a "governmental plan," as such term is defined under 29 U.S.C. § 1002(32), ERISA § 3(32). Doc. 9, pp. 2 – 6. ERISA defines "governmental plan" as a "plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). There is no dispute that Defendants are not governmental entities. Instead, Plaintiffs argue that, because UHS entered into a lease agreement with the Richmond County Hospital Authority (the "RCHA") in 1984, UHS is an "instrumentality" of government for purposes of the exemption. The argument is without any legal or factual basis.

        1.    <u>Governing case law dooms Plaintiffs' argument.</u>

As an initial matter, Plaintiffs fail to cite a single case in their Remand Motion holding that a private, nonprofit corporation (such as UHS here) can become a "quasi-governmental" employer for purposes of satisfying ERISA's governmental plan exemption. Not surprisingly, given that Defendants are unaware of any case issuing such an attenuated holding.

Instead, courts addressing the issue have all rejected the same legal argument Plaintiffs proffer here. For example, like the Plaintiffs here, the plaintiffs in *Darden v. Dekalb Med. Ctr. Inc.*, 2008 WL 11319981, *2 (N.D. Ga. Jan. 7, 2008) argued their employer, DeKalb Medical Center, Inc., should "be viewed as an instrumentalit[y]" of the state for purposes of ERISA" because the employer was originally created by a hospital authority. *Id.* at *2. The court held the governmental exemption did not – and could not – apply to the disputed welfare benefits because the hospital employer had incorporated and became a private, nonprofit hospital system. *Id.* The *Darden* court further explained that, "[a]lthough the hospital leases property from the hospital authority, the hospital authority does not manage the hospital's day-to-day business affairs, nor did it establish the employee benefit plan." *Id.*  This is precisely the scenario Plaintiffs seek to

challenge here – an employee benefit plan established by UHS (not the RCHA) in its private nonprofit capacity, long after UHS and the RCHA entered into their 1984 lease arrangement.[2]

The district court in *Germaine v. Unum Life Ins. Co. of Am.*, 2004 WL 2624873, *11 (N.D. Ga. Sept. 23, 2004) held similarly. There, the court ruled that <u>neither</u> the hospital authority nor the nonprofit employer (despite having originally been created by the hospital authority) was a government instrumentality for purposes of ERISA's governmental plan exemption. *Id.* The facts at issue in *Germaine* were nearly identical to those here, including that the hospital authority had established the hospital employer (Athens Regional Medical Center), the hospital authority leased its assets to Athens Regional pursuant to a lease agreement, under which the hospital authority transferred all employees, operations and liabilities of the hospital to Athens Regional, and under which Athens Regional took over the daily operation of the hospital. *Id.*, at *1. Finally, like here, Athens Regional established and maintained the challenged benefits program without any involvement by the hospital authority. *Id.*

Plaintiffs attempt to avoid application of the above cases by relying on *Williams-Mason v. Reliance Standard Life Ins.*, 2006 WL 1687760, *1 (S.D. Ga. June 16, 2006).  But *Williams-Mason* did not involve a private employer entity at all.  Rather, the hospital authority itself provided the challenged benefits. Thus, the court reasoned that the governmental plan exemption applied due to the unique characteristics of the *hospital authority*, "lying somewhere between a local, general-purpose governing body (such as a city or county) and a corporation."  *Id.*  The *Williams-Mason* court never addressed the legal issue involved here, namely whether a private nonprofit employer such as UHS (which, as discussed in Section II.B.2 below, has sole control over its employees and

---

[2] There is no dispute that the retiree medical benefit program Plaintiffs seek to challenge here was established by UHS in its private employer capacity. *See* Doc. 1-1 (Compl.), ¶ 3 & Ex. A.  Nor are there any allegations by Plaintiffs that the RCHA was involved in the creation or maintenance of the retiree medical benefit program.

sole responsibility with respect to its benefits programs) can be deemed a governmental instrumentality under ERISA.

The other main case upon which Plaintiffs rely – *Hutto v. Blue Cross Blue Shield of Ala.*, 1997 WL 659806, (M.D. Ala. June 9, 1997) – is inapposite for similar reasons. *Hutto* involved a governmental employer that was a <u>public</u> corporation. *Id.* at *1. Thus, the *Hutto* court held that, because the employer was a "political subdivision of the state," created directly by the state, its benefit plans were subject to the governmental plan exemption. *Id.* at *2.

The remaining cases cited by Plaintiffs – *Richmond Cnty. Hosp. Auth. v. Se. Newspaper Corp.*, 252 Ga. 19 (1984) and *Richmond Cnty. Hosp. Auth. v. Richmond Cnty.*, 255 Ga. 183 (1985) – do not address ERISA's governmental exemption issue at all. Plaintiffs appear to cite these cases in an attempt to argue that UHS is a governmental instrumentality under ERISA because it is subject to a separate state law, the Georgia Open Records Act (the "ORA"). But even assuming these cases held that UHS was subject to the ORA (which, as discussed below, they do not), the analysis as to whether a private entity is subject to a state open records law has no bearing on whether that same entity is an instrumentality of government for purposes of satisfying ERISA's governmental plan exemption. Further, both cases are distinguishable for the additional reasons set forth below.

*Se. Newspaper Corp.* held that the RCHA (not UHS) was subject to the ORA and, therefore, had to disclose information about its own *Authority* employees. At the time the decision was rendered (January 1984), the RCHA (not UHS) employed the individuals working at the hospital. *See* 252 Ga. at 19 (explaining the records request sought personnel information of those persons "employed by [the RCHA]"). Indeed, as set forth in Section II.B.2 below, UHS did not become the legal employer of hospital employees until nearly a year later, in December 1984.

*Richmond County* addressed the validity of the lease entered into between the RCHA and

UHS in December 1984.  255 Ga. at 184. The court did not opine that UHS was legally required

to comply with the ORA; it merely noted that the RCHA had included a contractual term in the

lease promising compliance with the ORA.  *Id.* at 191. In fact, nothing in the *Richmond County*

decision bolsters Plaintiffs' theory that the RCHA and UHS are so closely intertwined that UHS

may properly be deemed a governmental instrumentality. To the contrary, the court upheld the

lease arrangement, despite the fact that members of the RCHA served on the UHS board of

trustees, because to hold otherwise would "overlook[] the principle that corporations are separate

and distinct entities in the eyes of the law." *Id.* at 186.

   2. <u>Mr. Taylor's affidavit cannot salvage Plaintiffs' governmental plan theory.</u>

  In an attempt to argue that the RCHA "control[s] and operate[s]" UHS (Doc. 9, p. 4),

Plaintiffs rely on an affidavit from Plaintiff Robert Taylor who served as CFO of UHS until his

retirement in 2007.  Plaintiffs argue, and Mr. Taylor testifies, as follows:

- The RCHA "has absolute control over Defendant [UHS]." Doc. 9, pp. 4-5.

- The RCHA "is the lessor of all of the assets, including real estate utilized by the Defendant in its operation." Doc. 9, p. 5; *see also* Doc. 10, Taylor Aff., ¶ 9 ("part of the assets that [UHS] operated were acquired from the [RCHA] by virtue of a lease").

- Defendant [UHS] "is subject to the [RCHA]" because board members of University Hospital have to be approved by the RCHA. Doc. 9, p. 5; Doc. 10, Taylor Aff., ¶ 15 (testifying it is "his opinion that the hospital were [*sic*] a quasi-governmental entity in that the [RCHA] had the power to approve the appointment of members to the [UHS] Board").

- UHS "borrowed for capital projects at governmental rates by issuing Revenue Anticipation Certificates through the [RCHA]." Doc. 10, Taylor Aff., ¶ 9.

But for the single statement in Mr. Taylor's affidavit that "part of the assets that [UHS] operated

were acquired from the [RCHA] by virtue of a lease," all of these assertions are grossly

exaggerated and made without providing proper context.[3]   Further, as set forth below, none of them are sufficient to demonstrate the governmental plan exemption applies here.

*The Lease Agreement.*   Plaintiffs reference the December 14, 1984 lease agreement (the "Lease Agreement") in their Remand Motion to support their assertion that the RCHA has "absolute control" over UHS and its operations. Notably, however, Plaintiffs do not attach it to Mr. Taylor's affidavit.[4]   Contrary to Plaintiffs' assertion, the Lease Agreement (which Defendants have attached as an exhibit to Mr. Belkoski's affidavit) does not demonstrate that the RCHA has control over UHS and its operations. As the Lease Agreement itself demonstrates, UHS operates the facilities covered by the Lease Agreement without any control by the RCHA. In fact, the Lease Agreement expressly provided that UHS (not the RCHA) is responsible for the day-to-day business affairs and operations of the hospital facilities covered by the Lease Agreement. *See* Belkoski Aff., ¶ 13; *see also id.*, Ex. A, Section 3 ("UHS shall operate University Hospital . . ."; explaining UHS shall have sole discretion to determine whether to augment services); Section 7 ("UHS shall operate University Hospital and its related facilities in compliance with all restrictions and regulations . . ."); Section 10(b) ("UHS is permitted to use all such assets in the operation of University Hospital . . . UHS shall have complete discretion in deciding whether or not to repair or replace any [] assets"); Section 11 ("UHS assumes all operating and other liabilities of RCHA"); Section 14 ("UHS shall be the governing body of University Hospital as contemplated by the bylaws of the Medical Staff of University Hospital, and UHS shall have all the rights and authorities of the governing body"); Section 19 ("UHS shall have the right and authority to make

---

[3] Mr. Taylor also offers unsubstantiated legal conclusions in his affidavit (Doc. 10, ¶¶ 14 – 17), all of which should be disregarded by the Court. *See Wilson v. Greater Ga. Life Ins. Co.*, 2015 WL 11549074, *2 (N.D. Ga. May 21, 2015) (disregarding declarants' legal conclusions when deciding whether insurance plan was an ERISA governed plan).

[4] Instead, Plaintiffs attach a short form lease, which is a supplement to and references the Lease Agreement.

and enforce such reasonable rules and regulations as, in its judgment, may from time to time be needed for the safety, care and cleanliness of the leased premises"). This is precisely the same relationship that the *Darden* and *Germaine* courts both held was insufficient to constitute a governmental instrumentality under ERISA.

Even more significantly, Section 12 of the Lease Agreement demonstrates that (like in *Darden* and *Germaine*), all employees of the RCHA became employees of UHS, a separate nonprofit corporation, as of December 1984. Belkoski Aff., ¶ 14 & Ex. A. Since that time, UHS has been "solely responsible for the payment of all salaries and employee benefits,"[5] and has had full discretion over employment and employee benefits decisions with respect to current and former UHS employees, including "the discretion to determine and adjust salaries and employee benefits," with no input or control by the RCHA. *Id.*, ¶ 14 & Ex. A. Thus, since December 1984, UHS employees have been treated as private employees and not as employees of the RCHA or any public or municipal corporation or entity. *Id.*, ¶¶ 14 & 16.

***UHS's Board of Directors.*** Plaintiffs argue that UHS "is subject to the [RCHA]" because the "Board Members of University Hospital, now Piedmont, have to be approved by the [RCHA]." Doc. 9, p. 5; *see also* Doc. 10 (Taylor Aff.), ¶ 15. The argument is misleading, at best. Contrary to Plaintiffs' assertions, the RCHA has no unilateral right to appoint the UHS Board members. In fact, only three of the UHS Board members must be RCHA members, all of whom are subject to

---

[5] Section 12 of the Lease Agreement contains a reference to a pension plan previously sponsored by the RCHA for RCHA employees. As set forth in Mr. Belkoski's affidavit, that now-terminated pension plan transferred to UHS's sole sponsorship in connection with entry into the Lease Agreement, and UHS treated and maintained the plan as an ERISA plan until the plan's termination in 2018. *See* Belkoski Aff., ¶ 15 & Ex. C (last Form 5500 filed for the pension plan with the U.S. Department of Labor reflecting its ERISA plan status). In addition to considering the Form 5500 as part of the referenced affidavit, the Court also may properly take judicial notice of the regulatory filing. *Cervantes v. Invesco Holding Co.,* 2019 WL 5067202, *11-12 (N.D. Ga. Sept. 25, 2019) (citing *Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1276–77 (11th Cir. 1999)).

approval by both the RCHA and Piedmont, and are subject to removal, at any time and for any reason, by a majority vote of the Board of Directors of Piedmont Healthcare (now, the sole member of UHS).  Belkoski Aff., ¶¶ 9, 11(a) & 11(b).  More specifically, the UHS Board is comprised of at least thirteen members, three of whom are designated by Piedmont Healthcare and ten of whom must be independent members of the community. *Id*., ¶ 11(a). Only three of the community members must be members of the RCHA, but only to the extent that there are three members of the RCHA willing and able to serve on the UHS Board. *Id.*  In fact, the current UHS Board consists of fourteen voting members, only four of whom are members of the RCHA. *Id.*, ¶ 12.

No operational control by the RCHA, let alone "absolute control," can be inferred from these facts.  Even *Richmond Cnty. Hosp. Auth. v. Richmond Cnty.*, one of the cases upon which Plaintiffs rely, supports this conclusion. *See* 255 Ga. at 185 – 86 (rejecting contention that Lease Agreement with the RCHA was invalid because it was not entered into between legally separate and distinct entities since RCHA members were serving on board of trustees).

***UHS Does Not "Borrow" at "Government Rates."***  Mr. Taylor's statement that UHS was able to borrow for capital projects at "government rates" improperly suggests that UHS is treated as a governmental entity. That is not actually the case. As the Lease Agreement demonstrates, the RCHA (not UHS) is permitted to exercise its statutory authority to issue revenue anticipation certificates (*i.e.*, bonds) in connection with the financing of the obligations of the RCHA imposed by Georgia's Hospital Authorities Law, O.C.G.A. § 31-7-70 *et seq*. Belkoski Aff., ¶ 17 & Ex. A (Section 8). Further, the financing is <u>not</u> generally available to UHS or Piedmont, and the financing must be used for a narrow set of purposes covered under the Lease Agreement.  *Id*. This is merely a mechanism through which the RCHA can fund improvements to property it already owns, and

does not (as Mr. Taylor's affidavit suggests) permit UHS or Piedmont Healthcare to obtain "government rates" in any quasi-governmental capacity. *Id*., ¶ 17.

In sum, when measured against all of the evidence in the record, including the express provisions in the Lease Agreement itself, none of the testimony provided by Mr. Taylor demonstrates that UHS was controlled by the RCHA such that UHS could be construed as an "instrumentality" of government for purposes of satisfying ERISA's governmental plan exemption.

3.  <u>Plaintiffs' own arguments belie any assertion that Defendants are "quasi-governmental" employers.</u>

Plaintiffs' own legal arguments directly contradict the assertion that Defendants are "quasi-governmental" employers. Plaintiffs concede the two retirement plans sponsored by UHS – the 403(b) plan and a now-terminated defined benefit pension plan – are ERISA plans. *See* Doc 9, p. 2 (arguing the Medicare supplement benefits at issue here are separate from these retirement plans and therefore, are not ERISA-covered plans). Plaintiffs are correct that these two plans are (and were) ERISA plans. *See, e.g.,* Belkoski Aff., Ex. C (attaching the ERISA Form 5500 that UHS filed with the U.S. Department of Labor for the pension plan).  If the retirement plans sponsored by UHS are not exempt from ERISA under the governmental plan exemption (*i.e.,* because UHS is not an "instrumentality" of government employer), then it follows the medical plans offered by UHS also are not exempt given that the <u>same</u> employer is providing both types of benefits. Plaintiffs fail to offer any legal support in their Remand Motion that would support the notion that the same employer can sponsor both ERISA-covered plans as well as plans that would be subject to ERISA's governmental plan exemption.

**C.      The ERISA plan is not an unfunded "excess benefit plan."**

As a final matter, Plaintiffs argue that, because the challenged retiree medical plan is "unfunded," the plan is exempt from ERISA as an "excess benefit plan" under 29 U.S.C. § 1002(36), ERISA § 3(36).  Doc. 9, p. 7. Plaintiffs' argument is nonsensical and evidences a complete misunderstanding of the exemption.

An "excess benefit plan" is one that is established "*solely for the purpose*" of providing retirement benefits in excess of the benefit and contribution limits imposed on qualified <u>retirement</u> plans (such as 401(k) and 403(b) plans) by Section 415 of the Internal Revenue Code of 1986, as amended ("Code Section 415").  29 U.S.C. § 1002(36), ERISA § 3(36) (emphasis added); 26 U.S.C. § 415.

The plan at issue here is not a retirement plan; it is a plan that provides retirees with *welfare* benefits, namely Medicare supplement benefits. Doc. 1-1 (Compl.), ¶¶ 5, 7, 9 & 11 (referencing the Medicare supplement benefits); *id.*, ¶ 17 (alleging Plaintiffs' face uncertainty over the payment of their "medical insurance in their older age"); *id.*, Ex. A. The sole purpose of the plan alleged here is to help retirees pay for their (Medicare supplement) healthcare coverage. Further, the amount of the employer-paid premium provided under the retiree medical plan is entirely dependent on the Medicare supplement plan in which the participant retiree enrolls, and has no connection to whether the participant has or has not received the maximum benefits allowable under Code Section 415. Thus, the "excess benefit plan" exemption has no application here.

Plaintiffs attempt to circumvent these material distinctions by arguing in their Remand Motion that the Medicare supplement benefits plan is "unfunded," despite not having made any allegations along these lines in their Complaint. Doc. 9, p. 7. Tellingly, Plaintiffs make no argument as to the remainder of the exemption's requirements, including that the plan is maintained solely to provide benefits in excess of the Code Section 415 limits. Nor can they given

that, as explained above, the challenged retiree medical plan has nothing to do with those limits.

Finally, Plaintiffs' own exhibits defeat the argument that the challenged retiree medical plan is an "excess benefit plan." None of the documents attached as Exhibit A to Plaintiff's Compliant – which Plaintiffs allege constitute the "written agreement" to provide the Medicare supplement benefits – refer in any way to Code Section 415 or its substantive provisions. This is fatal to their argument that ERISA's "excess benefit plan" exemption applies here. *See Thomas v. First S. Bank*, 2017 WL 4398653, *3 (S.D. Ga. Sept. 29, 2017) (citing *Nw. Mut. Life Ins. Co. v. Resolution Tr. Corp.*, 848 F. Supp. 1515, 1519 (N.D. Ala. 1994)) ("[A]n employee benefit plan cannot serve the purpose of providing benefits in excess of these limitations without expressly referring either to IRC Section 415 or its substantive provisions.").

For all of these reasons, Plaintiffs cannot avoid ERISA's application here.

### III.  Plaintiffs' State Action Is Completely Preempted By ERISA Because No Other Independent Legal Duty Is Implicated.

Plaintiffs' moving brief is focused entirely on the ERISA plan issue and thus, they fail to address this second prong of the complete preemption test. Therefore, Plaintiffs have waived the right to make any argument that Defendants' alleged conduct (or failure to act) implicates an independent legal duty.  *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or [which are] raised for the first time in a reply brief are deemed waived."). Nonetheless, as set forth below, there is no separate legal duty that exists to support Plaintiffs' claim.

The operative question in connection with this second prong of the complete preemption test is whether Defendants' alleged conduct violates a legal duty that exists independently of ERISA. No such legal duty exists here. The only misconduct alleged by Plaintiffs is akin to an anticipatory breach of contract (*i.e.*, the failure to guarantee the continued provision of the

Medicare supplement benefits to Plaintiffs for the rest of their lives). Because the purported contract upon which Plaintiffs rely to bring their claim constitutes an "employee welfare benefit plan" under ERISA, Defendants' purported refusal to act in a manner consistent with the alleged contract is "inextricably intertwined" with the plan and negates the existence of any independent contractual duty. *See Woods*, 2017 WL 727766 at *9 (rejecting plaintiff's argument that his former employer had an independent legal duty not to breach a contract promising him certain welfare benefits following termination from employment because the promise to provide the benefits was an ERISA welfare benefit plan) (citing *Conn. State Dental Ass'n*, 591 F.3d at 1353 (breach of contract claims based on denial of payment of ERISA benefits "arise solely under ERISA or ERISA plans and not from any independent legal duty") and *Borrero*, 610 F.3d at 1304 (concluding that "state law claims[ ] based predominately on their contracts" sufficiently "implicate[d] legal duties dependent on the interpretation of an ERISA plan" and were thus completely preempted)).

## CONCLUSION

Plaintiffs' Remand Motion fails to set forth any viable legal or factual basis for remand of this case to state court, especially in light of ERISA's super preemption provision. Therefore, for all of the reasons set forth above, and those set forth in the accompanying affidavit, Defendants respectfully request that the Court deny Plaintiff's Remand Motion

Dated: May 19, 2023.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on this day, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to attorneys of record.

Dated: May 19, 2023.

Respectfully submitted,

*/s Edward H. Wasmuth, Jr.*
Edward H. Wasmuth, Jr., Georgia Bar No. 739636
SMITH GAMBRELL & RUSSELL, LLP
1105 W. Peachtree Street, NE
Suite 1000
Atlanta, GA 30309
404.815.3503
ewasmuth@sgrlaw.com

*Attorneys for Defendants University Health
Services, Inc. and Piedmont Healthcare, Inc.*